**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD L TSOSIE,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL NO. 3:CV-10-2104** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **ANGELA DUNBAR,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

## I.    Introduction

On October 12, 2010, Plaintiff Ronald L. Tsosie, a federal prisoner

incarcerated at the Canaan United States Penitentiary (USP-Canaan), in Waymart,

Pennsylvania, filed this *Bivens*[1] action pursuant to 28 U.S.C. § 1331.  Named as

Defendants are Bureau of Prisons (BOP) and the following BOP employees: Angela

Dunbar, Associate Warden; Barbara Sullivan, Health Services Administrator (HSA);

and David Mrad, Lieutenant of the Special Housing Unit (SHU).

---

[1]  In *Bivens*, the Supreme Court held that a plaintiff may obtain damages for injuries caused by a federal agent acting "under color of his authority" in violation of a claimant's constitutionally protected rights.  *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971). *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

Mr. Tsosie presents two Eighth Amendment claims.  The first is a conditions of confinement claim, and the second sets forth a claim of deliberate indifference to his various medical ailments.  Doc. 1, Compl.  He names all Defendants in their individual and personal capacities, and seeks injunctive as well as monetary relief.

Presently before the Court is the BOP Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment.  Doc. 15.  Mr. Tsosie has filed a response to the motion, and Defendants have filed a reply brief.[2]  Thus, the motion is ripe for disposition.  Also pending before the Court is Plaintiff's Motion for Judicial Notice to include additional exhibits in support of his opposition to Defendants' motion.  Doc. 37.  For the reasons set forth below, the Defendants' motion for summary judgment will be granted and Plaintiff's Motion for Judicial notice will be denied.

---

[2]  In their Reply Brief (Doc. 38), Defendants' notified Mr. Tsosie that his counter statement of material facts (Doc. 35) failed to comply with M.D. Pa. Local Rule 56.1 as it did not: (1) correspond to the numbered paragraphs in Defendants' statement of facts; and (2) failed to cite to the record supporting each of his statements.  As a result, Plaintiff was granted leave to correct these inadequacies.  Doc. 41.  On October 17, 2011, Mr. Tsosie filed an amended statement of disputed facts.  Doc. 42.  However, Mr. Tsosie failed to correct the deficiencies of his original counter statement of material facts.  Rather, Mr. Tsosie provides his own 57 paragraph statement of undisputed facts, some that correlate to the Defendants' 100 paragraph statement of material facts, but most of which do not.  M.D. Pa. Local Rule 56.1 provides, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  Mr. Tsosie's failure to follow the local rules requires the Court to scour the extensive record to determine whether or not facts submitted by Plaintiff create an issue of material fact which might preclude summary judgment.  "Judges are not like pigs, hunting for truffles buried in the record."  *Doeblers Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006).  Nevertheless, the Court has independently reviewed Mr. Tsosie's submission, and where a material or genuine issue of fact is presented relevant to the Defendants' motion, the Court will note the same.

## II.     Background

### A.     Allegations of the Complaint.

At all times relevant to the Complaint, Mr. Tsosie was housed in USP-Canaan's SHU.  Doc. 1, Compl.  Mr. Tsosie alleges that Lt. Mrad "has a personal unwritten policy in depriving inmates of all their property and mattress."  Doc. 20, Defs.' Statement of Material Facts (DSMF) ¶1.  Lt. Mrad allegedly ordered Mr. Tsosie's property and mattress removed from his cell and did not returned them for 14 hours.  *Id.* ¶2.  As a result, "Plaintiff had to lay on cold steel with only a T-shirt and boxers, socks this whole time."  Doc. 1 at p. 3.[3]  Plaintiff also claims he was denied pain medication during this period of time.  DSMF ¶2.  Lt. Mrad also had the custom of requiring inmates who damage clothes or bedding to "be put on paper (e.g. blanket, sheet and clothes) for a period of 4 days."  *Id.* ¶5.

Mr. Tsosie also claims he was denied medical treatment for an injured left shoulder, Hepatitis C, and a glandular condition.  *Id.* ¶6.  "Since May 09," Mr. Tsosie has tried unsuccessfully to get proper treatment for his shoulder injury.  *Id.* ¶7.  Finally, when he received an MRI of his shoulder, it revealed an injury.  *Id.*  As for his Hepatitis C condition, Mr. Tsosie alleges that a physician told him in February 2010 that he needed a liver biopsy which has yet to be performed.  *Id.* ¶8.  With regard to his gland problem, Mr. Tsosie states that for almost two years, an Ear Nose and Throat (ENT) doctor told him that he needs an MRI in advance of having

---

[3]  Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the Electronic Case Filing system (ECF) rather than the page number of the original document.

a gland removed.  *Id.* ¶9.  However, "Health Services" at USP-Canaan "took it upon themselves to change" the doctor's order.  *Id.*  When Mr. Tsosie sent a request slip to the medical department inquiring as to when he would receive his MRI, Assoc. Warden Dunbar responded that "it would be done" in December 2009.  *Id.* However, as of the date of filing the Complaint, it was yet to be performed.  *Id.*

HSA Sullivan is named as a defendant because whenever Mr. Tsosie inquired about his medical needs, she would act "annoyed" and "roll her eyes" at him and "just say anything that don't even happen."  *Id.* ¶10.  Finally, Mr. Tsosie alleges that on one occasion a non-defendant gave him the "wrong medication" and as a result, he suffered an adverse reaction.  *Id.* ¶11.

### B.      Mr. Tsosie's Non-Medical Claims.

Mr. Tsosie arrived at USP-Canaan on December 22, 2008, and was assigned to the SHU pending the investigation of an incident that occurred at the transferring facility.  DSMF ¶13 and ¶15.  He remained in the SHU from December 22, 2008, until April 29, 2009.  *Id.* ¶16.  He returned to the SHU briefly on May 5, 2009, and then again from May 17, 2009, until March 23, 2010.  *Id.* ¶17.  He was again housed in the SHU from March 29, 2010, until November 10, 2010, when he was transferred to USP-Lewisburg.[4]  *Id.* ¶¶17-18.

During his stay at USP-Canaan, Mr. Tsosie was released on authorized writ, or temporary absence from the facility, on at least three occasions:  (1) October 13, 2009 - October 23, 2009; (2) March 23, 2010 - March 29, 2010; and (3) June 25,

_____

[4]  Mr. Tsosie is presently housed at USP-Allenwood, in White Deer, Pennsylvania.

2010 - July 6, 2010.  *See* Doc. 21, Defs.' Exhs. pp. 6, 15, 61, 68, and 77; and Doc. 21-1, Defs.' Exhs. at p. 1.

During all times relevant to this action, David Mrad was assigned as the Lieutenant in the SHU.  DSMF ¶14.  At least once a week, routine cell searches were completed in the SHU.  *Id.* ¶18.  The searches included putting the inmate's mattress through the institution's scanner in search of any metals or weapons.  *Id.* ¶20.  On November 25, 2009, Mr. Tsosie became agitated when his mattress was removed for scanning during a routine cell search.  *Id.* ¶21.  After his mattress was scanned, it was returned to him.  *Id.* ¶22.

There is a dispute of fact as to when Mr. Tsosie's mattress was returned to him.  According to Lt. Mrad, and CO Stuffle (non-defendant), Plaintiff's mattress was returned to him within a few hours but he opted not to use it, and elected to sleep on the metal portion of the bed.[5]  *Id.* ¶¶22-23; Doc. 34-1, Pl.'s Exhs. at p. 65.  Mr. Tsosie counters that he was without his property and mattress from 8 a.m. until 10 p.m.  Doc. 36, Tsosie Decl. at p. 5.  He denies refusing to use his mattress or voluntarily laying on the steel frame.  *Id.*  He suggest he would not do this because it would be painful as he suffers from degenerative joint disease, disc disease, and a

---

[5]  Mr. Tsosie alleges Lt. Mrad's declaration as to this event is based on hearsay.  He surmises that Lt. Mrad's statements are based on the declaration of CO Stuffle, a non-defendant in this case.  Assuming in arguendo that this is true, the Court need not rely on the questioned statements by Lt. Mrad, but may rely on the Declaration of CO Stuffle, who affirms to have personal knowledge of the mattress incident as it was provided to the Court by Mr. Tsosie.  *See* Doc. 34-1 at p. 65.  CO Stuffle noted the mattress was returned within a few hours but Plaintiff elected not to use it.  *Id.*

bone spur and labral tear in his left shoulder.  *Id.* [6]

Mr. Tsosie was never placed on the alternative paper clothing program. DSMF ¶ 28.

**C.   Mr. Tsosie's Medical Claims**

**1.   Mr. Tsosie's Painful Left Shoulder.**

On May 17, 2009, Mr. Tsosie, in concert with two other inmates, participated in the assault of another inmate.  Doc. 34-1 at p. 28.  He was seen by medical staff the same day and reported that he "fell down the steps."  Doc. 21-1 at p. 51.  He was treated for a small superficial abrasion of his left index finger.  *Id*.

On June 1, 2009, while in the SHU, Mr. Tsosie complained of a bruised and swollen leg, and an inability to lift his arm over his head.  DSMF ¶29.  He was prescribed Naproxen, a pain medication, three times a day for seven days.  *Id.* ¶31; Doc. 21-1 at p. 49.  On June 10, 2009, Mr. Tsosie was seen again in the SHU for complaints of left shoulder and left leg pain.  DSMF ¶32.  X-rays were ordered.  *Id*. ¶33.  On June 29, 2009, and July 13, 2009, it was noted that Mr. Tsosie's x-rays were pending.  *Id.* ¶34.  Although no x-rays were taken yet, on both dates Mr. Tsosie's script for Naproxen was renewed.  Doc. 21-1 at pp. 42-43.  His script was refilled again on July 20, 2009.  *Id.*  at p. 41.

---

[6]  Yet, the record reveals that on at least one occasion, in September 2010, Mr. Tsosie was viewed by medical staff "laying on towel on cement on his back" in his SHU cell. *See* Doc. 21 at p. 50.

On July 22, 2009, Mr. Tsosie's leg and shoulder were x-rayed, with negative results.  DSMF ¶35.  On August 10, 2009, although Mr. Tsosie's x-rays were negative, and a recent CT scan of his neck and spine showed no significant findings, an MRI of his shoulder was ordered due to his continued complaints of pain.  *Id.* ¶¶36-37.  On August 14, 2009, Mr. Tsosie's Naproxen prescription was again renewed.  Doc. 21-1 at p. 38.  On August 21, 2009, during an infections disease clinic visit, Mr. Tsosie voiced a complaint of shoulder discomfort.  DSMF ¶38.  The MRI of his shoulder was pending.  *Id.* ¶39.  On September 24, 2009, Mr. Tsosie's Naproxen script was refilled and it was noted that the MRI of his shoulder was pending.  DSMF ¶40; Doc. 21-1 at p. 34.  From October 13, 2009, through October 23, 2009, Mr. Tsosie was released from USP-Canaan on a Federal Writ.  DSMF ¶41.  On October 27, 2009, and November 20, 2009, and December 16, 2009, Mr. Tsosie's Naproxen script was renewed.  Doc. 21-1 at pp. 17, 22-24.

On January 21, 2010, during a chronic care visit in the SHU, Mr. Tsosie complained of right shoulder pain.  DSMF ¶42.  At that time he was given medication renewals of his two psychotropic medications and Naproxen.  Doc. 21-1 at p. 14.  His Naproxen was renewed again on the following dates:  March 19, 2010; April 9, 2010; April 19, 2010; and May 26, 2010.  *Id.* at p. 3; Doc. 21 at pp. 72, 74 and 76.  On May 27, 2010, an MRI of Mr. Tsosie' left shoulder revealed acromioclavicular joint degeneration change,[7] posterior paralabral cyst and possible

---

[7]   The shoulder consists of four joints, one of which is the acromioclavicular joint. The acromion is the bone at the highest point of the scapula, right at the tip of the shoulder, lying just above the socket.  The acromioclavicular joint acts as a pivot, giving stability to the

(continued...)

labral tear with no evidence of rotator cuff tear.  DSMF ¶43.  Mr. Tsosie was

released again on writ from June 25, 2010, until July 6, 2010.  Doc. 21-1 at p. 1.

On November 10, 2010, Mr. Tsosie was transferred from USP-Canaan to

USP-Lewisburg.  DSMF ¶44.  From the time Mr. Tsosie complained of shoulder

pain, he was provided with anti-inflammatories,[8] x-rays, and an MRI.  *Id.* ¶45.  The

possible labral tear indicated on his MRI may indicate a need for surgery in the

future; however, there was no indication for immediate surgery while he was

incarcerated at USP-Canaan.  *Id.* ¶46.


**2.  Mr. Tsosie's Painful Left Ear.**

Mr. Tsosie arrived at USP-Canaan on December 19, 2008, with a medical

history including the following health problems: Hepatitis C; Axis I: Adjustment

disorder with depressed mood; esophageal reflux; back, ear and throat pain.  Doc.

21-2 at pp. 8-13.  January 15, 2009, was the first time Mr. Tsosie reported to sick

call complaining of pain in his left ear.  DSMF ¶48.  He alleges to have suffered from

a left ear ache since July 2008.  *Id.*  He was given oral antibiotics and antibiotic ear

drops.  *Id.* ¶49; Doc. 21-2 at p. 34.  On February 3, 2009, Plaintiff was seen at the

gastrointestinal clinic and complained of left ear pain and difficulty hearing.  DSMF

¶50.  He was prescribed Naproxen and referred to the Clinical Director for a consult

_____

[7](...continued)
shoulder girdle.  DSMF ¶43 n.5

[8]  Following the MRI, Mr. Tsosie's Naproxen was renewed on the following dates
while housed at USP-Canaan: July 28, 2010; September 3, 2010; September 9, 2010;
September 29, 2010; and October 8, 2010.  *See* Doc. 21 at pp. 47-67.

regarding his ear pain.  DSMF ¶51.  On February 10, 2009, he was evaluated the

Acting Clinical Director, Dr. Holloway, for left ear pain.  *Id.* ¶52.  Mr. Tsosie

expressed having "some pain from time to time none today".  DSMF ¶ 53; Doc. 21-1

at p. 60.  Aside from some dead skin cells in the middle canal, there were no other

significant findings regarding his left ear.  DSMF ¶¶54-55.  Mr. Tsosie was

prescribed another course of antibiotics and advised that if his condition did not

improve he would be referred to an Ear, Nose and Throat (ENT) specialist.  DSMF

¶56.  Mr. Tsosie was seen on March 9, 2009, with continued complaints of left ear

pain.  *Id.* ¶57.  It was noted that a consult to an ENT would be made.  *Id.* ¶58.

    Mr. Tsosie was seen by an ENT specialist on June 11, 2009.  *Id.* ¶59; Doc.

21-2 at p. 25.  At that time Mr. Tsosie reported no difficulty or problems swallowing.

Doc. 21-2 at p. 25.  The flexible fiberoptic laryngoscope examination showed a

bulging on the posterior pharyngeal wall towards the level of C1.  Although the ENT

had difficulty passing the scope the examination was completed and Mr. Tsosie's

larynx appeared clear, he had normal vocal chord mobility, and no masses were

noted.  *Id.*  The ENT's assessment was that Plaintiff's pain could be due to TMJ or

the mass in his posterior oropharynx.  *Id.*   A CT scan was ordered.  *Id.*  The July 24,

2009, the CT of Mr. Tsosie's cervical spine revealed no significant findings.  DSMF

¶60; Doc. 21-2 at p. 19.  On August 10, 2009, it was noted that a follow-up consult

with the ENT was pending.  DSMF ¶61; Doc. 21-1 at p. 40.

    On August 21, 2010, at an infections disease clinic encounter, Mr. Tsosie

complained of ear pain, and it was noted that the follow-up consult with the ENT

was still pending.  DSMF ¶62.  On January 5, 2010, Mr. Tsosie was seen a second

time by the ENT.  Doc. 21-2 at pp. 31-33.  On that date, Mr. Tsosie reported his earaches "occur randomly" but reported decreased hearing.  *Id*.  The specialist noted a tender mobile mass in the posterior aspect of the left mandibular gland and recommended a CT scan of the neck with contrast followed by the excision of the left submandibular gland.  *Id.*   On February 17, 2010, Mr. Tsosie was notified that a consult was pending for the CT scan of his neck.  DSMF ¶64.  Mr. Tsosie continued to complain of discomfort in his left ear.  *Id.* ¶65.

Mr. Tsosie was temporarily released from USP-Canaan on an authorized temporary absence from March 23, 2010 through March 29, 2010, and then again on June 25, 2010 until July 6, 2010.  *See* Doc. 21 at pp. 61, 68, 77 and Doc. 22-1 at p. 1.

On July 9, 2010, Plaintiff was prescribed antibiotics by the prison medical staff for a pustule in his nose which appeared to have grown in size.  *Id.* ¶66.  He was treated again for the pustule a week later.  *Id.* ¶67.  On September 29, 2010, Plaintiff again complained about discomfort in his left ear.  Doc. 21 at p. 48.  He was advised that the CT scan of his submandibular gland was pending.  DSMF ¶68.  He was treated with antibiotics.  *Id.* ¶69.

On November 10, 2010, Mr. Tsosie was transferred to USP-Lewisburg.  *Id.* ¶70.

**3.      Mr. Tsosie's Hepatitis C Treatment.**

For the majority of patients with chronic Hepatitis C, the disease is not immediately life-threatening.  *Id.* ¶78.  According to guidelines (released in June, 2009), data indicates that the degree of liver fibrosis is correlated with the AST/Platelet Ration Index (APRI), a simple ration between the level of a certain liver enzyme (AST) and the body's platelet level.  *Id.* ¶79.  The higher the APRI ratio, the greater the need for a liver biopsy to determine the extent of liver damage and whether interferon treatment is needed.  *Id.* ¶80.  Higher APRI values have been associated with higher stages of liver fibrosis (damage and scarring) on a biopsy. *Id.* ¶81.

The BOP has established criteria for determining whether or not a liver biopsy is indicated for a patient with chronic Hepatitis C.  *Id.* ¶73.  BOP institutions use the APRI score to prioritize which inmates need referral for biopsy.  *Id.* ¶82.  Inmates with an APRI of lower than 0.5 are lower priority for biopsy and treatment, and, conversely, those with an APRI of greater than 0.5 are higher priority for biopsy and treatment.  *Id.* ¶83.  Liver biopsies in the BOP are ordinarily conducted every five years, unless it is indicated that one is completed sooner.  *Id.* ¶84.  No single test provides the only means for the diagnosis and treatment of Hepatitis.  *Id.* ¶75.  Each test reflects a different type of investigation in formulating a medical opinion and treatment plan.  *Id.* ¶76.  The treatment received by an inmate depends on the severity of the disease and need for treatment.  *Id.* ¶77.

Mr. Tsosie had a liver biopsy in August 2005, while at USP-Terre Haute. *Id.*
¶85.  The results revealed no fibrosis, therefore requiring no treatment at that time.
*Id.* ¶86.  While at USP-Canaan, Mr. Tsosie was routinely evaluated in the chronic
care clinic (at least every 90 days; however, medical records indicate that he was
seen far more frequently) for Hepatitis C and other medical conditions. *Id.* ¶87.
Shortly after his arrival at USP-Canaan, on February 3, 2009, a chronic care visit.
Doc. 21-1 at p. 64.  At this time, Mr. Tsosie's Hepatitis status was discussed.  DSMF
¶88.  The possibility of having another biopsy was also discussed. *Id.* ¶89.

On May 5, 2009, Mr. Tsosie received an incident report charging him with the
making, possessing, or use of intoxicants after several gallons of a homemade
intoxicant were found in his cell.  Doc. 34-1 at p. 24.  On June 1, 2009, due to
conflicting evidence, the Disciplinary Hearing Officer expunged the charge  from Mr.
Tsosie's record. *Id*. at p. 26.  Mr. Tsosie adamantly denied actively using intoxicants
since 2004.[9]

On June 16, 2009, Dr. Holloway made an Administrative Note in Mr. Tsosie's
medical record noting that Mr. Tsosie was actively using alcohol based intoxicants
he was disqualified, per BOP policy, from receiving interferon treatment.  DSMF
¶¶90-91; Doc. 21-1 at p. 46.  However, Mr. Tsosie continued to be monitored and
considered for future treatment. *Id.* ¶92.  Inmates who abuse alcohol while
incarcerated are ordinarily re-evaluated for treatment after one year of being drug

---

[9]  In the past, Mr. Tsosie received disciplinary sanctions for the possession of
intoxicants (2004) and for refusing to take an alcohol test (2006).  *See* Doc. 34-1 at pp. 29-
30.

and alcohol free.  *Id.* ¶92 n.7.

On August 21, 2009, Mr. Tsosie was seen in the infectious disease clinic.  *Id.* ¶93.  Mr. Tsosie was released from USP-Canaan on writ from November 13, 2009, until November 23, 2009.  Doc. 21 at p. 6 and p. 15.  On November 23, 2009, after reviewing his medical records, it was noted that labs would be ordered and a routine liver biopsy would be recommended.  *Id.* ¶94.

Although Mr. Tsosie was due for another liver biopsy per BOP protocol, his condition did not warrant immediate action.  *Id.* ¶95.  Prior to Plaintiff being transferred to USP-Lewisburg, his liver biopsy was pending.  *Id.* ¶96.  Although he did not receive a biopsy while housed at USP-Canaan, he is currently awaiting the scheduling of a liver biopsy by USP-Lewisburg's medical staff.  *Id.* ¶97.


**4.     Mr. Tsosie's Alleged Receipt of Incorrect Medication.**

There is no indication that Mr. Tsosie was denied medical treatment or medication while at USP-Canaan.  *Id.* ¶98.  Medical records demonstrate that Plaintiff made numerous requests to have his medications refilled, and they were refilled by the pharmacy.  *Id.* ¶99.  There is no evidence that Mr. Tsosie was given the incorrect medication, or that he had an adverse reaction to any medicine he was administered.  *Id.* ¶100.  A review of Mr. Tsosie's medical record is negative for any report that suffered an adverse reaction to any medication he was given while at USP-Canaan.  Docs. 21, 21-1, 21-2, 21-3 and 21-4.

## II.      Standard of Review

### A.      Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007), meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965).  The pleading standard of Federal Rule of Civil Procedure 8 does not require "detailed factual allegations," but "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1959, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1950.

Thus, when determining the sufficiency of a complaint, a court must undertake a three-part inquiry.  *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  The inquiry involves: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  *Id.*

-14-

**B.     Motion for Summary Judgment**

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party.  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Liberty Lobby, Inc., 477 U.S. at 248, 106 S.Ct. at 2510).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with

facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument." *Berckeley Inv. Group, Ltd. Colkitt*, 455 F.3d 195,

201 (3d Cir. 2006). The moving party has the burden of showing the absence of a

genuine issue of material fact, but the nonmoving party must present affirmative

evidence from which a jury might return a verdict in the nonmoving party's favor.

*Liberty Lobby*, 477 U.S. at 256-57, 106 S.Ct. at 2514. "The non-moving party

cannot rest on mere pleadings or allegations," *El v. Southeastern Pa. Transp.

Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing

that there is a genuine issue for trial." *Saldana v. Kmart Corp.* , 260 F.3d 228, 231 -

232 (3d Cir. 2001). Allegations made without evidentiary support may be

disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). "Conclusory,

self-serving affidavits are insufficient to withstand a motion for summary judgment."

*Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). Hearsay testimony

contained in affidavits or statements that would be inadmissible at trial may not be

included in an affidavit to oppose summary judgment. *Petruzzi's IGA Supermarkets,

Inc. v. Darling-Delaware Comp.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993). The

non-moving party must raise "more than a mere scintilla of evidence in its favor" in

order to overcome a summary judgment motion. *Williams v. Borough of West

Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

### C.    Eighth Amendment Standard

The Eighth Amendment imposes certain duties upon prison officials to

"ensure that inmates receive adequate food, clothing, shelter and medical care, and

must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)).

To sufficiently allege an Eighth Amendment claim, a plaintiff must allege: (1) that the deprivation is sufficiently serious; and (2) that the defendant was deliberately indifferent to this deprivation. *Young v. Quinlan*, 960 F.2d 351, 359-60 (3d Cir. 1992) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-303, 111 S.Ct. 2321, 2323-2326, 115 L.Ed.2d 271 (1991)).  The Supreme Court has explained that the first prong is objective, while the second prong is subjective. *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324.  The inmate must satisfy this two-part conjunctive test.  Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference. *Farmer*, 511 U.S. at 837-38, 114 S.Ct. at 1979.

As to the first prong, only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement.  *See Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993); *Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S.Ct. at 995, 999-1000, 117 L.Ed.2d 156 (1992).  "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981).  To the extent that certain conditions are "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society.  *See Id.* at 347, 101 S.Ct. at 2399.  In reviewing this type of claim, the courts have stressed the importance of the duration of the complainant's

-17-

exposure to the alleged unconstitutional conditions, and a review of the "totality of the circumstances," as being critical in the Eighth Amendment determination, and not just the allegedly egregious conditions themselves. *Id.* at 362-33, 101 S.Ct. at 2407.  Under such an analysis, the Third Circuit Court of Appeals has found the denial of mattress for less than a day does not rise to the level of an Eighth Amendment violation.  *See Adderly v. Ferrier*, 419 F. App'x 135, 139-140 (3d Cir. 2011)(denial of clothing, toiletries, legal mail, mattress and shower for seven days did not constitute Eighth Amendment violation); *see also Milhouse v. Gee*, No. 1:CV-09-2134, 2011 WL 3627414 (M.D. Pa. Aug. 17, 2011)(two week denial of mattress was not sufficiently serious to rise to the level of an Eighth Amendment violation); *Boyd v. Bush*, No. 2:07-CV-524-MEF, 2011 WL 4101509 *18 (M.D. Ala. July 11, 2011)(removal of disciplinary custody inmate's mattress from 6 a.m. to 6 p. m. on weekdays does not rise to the level of an Eighth Amendment violation); *Williams v. Delo*, 49 F.3d 442, 444 (8th Cir. 1995)(four days without clothing, mattress, or any bedding was not a constitutional violation).

As for the second component of an Eighth Amendment claim, the question is whether the defendant acted with deliberate indifference to the inmate's health or safety.  *Hudson*, 503 U.S. at 8, 112 S.Ct. at 999.  To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. 837-38, 114 S.Ct. at 1979.  Deliberate indifference can also be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with [medical] treatment once prescribed."

*Estelle*, 429 U.S. at 104-05, 97 S.Ct. at 291.

Deliberately delaying necessary medical diagnosis for a long period of time in order to avoid providing care may constitute deliberate indifference that is actionable.  *See Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir.1993).   A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is ... so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).  Persistent severe pain qualifies as a serious medical need.  "If 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment."  *Id.* at 347 (quoting *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290).

Mere allegations that a physician or a medical department staff member "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ."  *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.  Similarly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice."  *Id.*, 429 U.S. at 107, 97 S.Ct. at 293.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."  *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).  Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health

care provider.  *White v. Napoleon*, 897 F.2d 103, 108-110 (3d Cir. 1990).  In sum, negligence, unsuccessful medical treatment, or an inmate's disagreement with his medical treatment is insufficient to establish deliberate indifference.  *See Durmer*, 991 F.2d at 69.

IV.     **Discussion**

       A.     **Sovereign Immunity**.

       Mr. Tsosie's claim for damages against the BOP and the Defendants in their official capacities is barred under the Eleventh Amendment.  Under the doctrine of sovereign immunity, the United States is immune from suit unless Congress has expressly waived the defense of sovereign immunity by statute.  *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983).  A suit against a government officer in his or her official capacity is, in essence, a suit against the government.  *Kentucky v. Graham*, 473 U.S. 159, 165-55, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).  The United States has not consented to be sued for monetary damages based on a constitutional violation or, in other words, for a "*Bivens*-type cause of action directly against a federal agency."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 486, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994). Because the principle of sovereign immunity applies equally to agencies of the United States, agencies are also immune from suit in the absence of a waiver of sovereign immunity.  *Id.*  at 475, 114 S.Ct. at 1000; *Anselma Crossing, L.P. v. U.S. Postal Service*, 637 F.3d 238, 240 (3d Cir. 2011).  Therefore, the Court will grant

defendants' motion to dismiss the damages claims[10] against the BOP and the

individual defendants in their official capacities under Fed. R. Civ. P. 12(b)(6).[11]

>    **B.    Denial of Mattress and Property for 14 Hours on November 25, 2009.**

Here, regardless of which parties' set of facts is applied, the maximum period

of time Mr. Tsosie was deprived of his mattress and property was 14 hours.

Pursuant to the previously cited Eighth Amendment case law, the denial of his

mattress, bedding and property for this short period of time fails to satisfy the

objective component necessary to establish an Eighth Amendment conditions of

confinement claim.  Moreover, there is no evidence that the denial of personal

property or his mattress subjected him to a significant risk of serious harm.[12]  Based

---

[10]  As for Mr. Tsosie's request for injunctive or declaratory relief from the defendants named in this action, those claims are now moot given his transfer from USP-Canaan to another facility.  *See Fortes v. Harding*, 19 F.Supp. 2d 323, 326 (M.D.Pa.1998) ( "Fortes' transfer to another institution moots any claims for injunctive or declaratory relief.").

[11]  To the extent Mr. Tsosie asserts in his opposition materials that he has asserted a claim under the Federal Tort Claims Act (FTCA) we disagree.  Under the FTCA, sovereign immunity is waived against persons suing the federal government for the commission of various torts.  *See Simon v. United States*, 341 F.3d 193, 200 (3d Cir. 2003). The only proper Defendant for purposes of an FTCA claim is the United States of America.  *See* 28 U.S.C. § 2679(d).  Mr. Tsosie neither references the FTCA in his Complaint nor does he name the United States as a defendant in his action.  Moreover, any medical malpractice claim he seeks to advance under the FTCA would be subject to dismissal as Plaintiff failed to comport with the state tort laws of Pennsylvania.  Pa. R. Civ. P. 1042.3 requires the filing of a Certificate of Merit within sixty days after the filing of the complaint.  The Certificate of Merit affirms that an appropriate licensed professional has found that a reasonable probability that the care the Plaintiff received fell outside acceptable professional standards and that such conduct caused him harm.  Mr. Tsosie has not filed a Certificate of Merit in this case.  Accordingly, the Court does not find Mr. Tsosie's present action contains a FTCA component and will not address such a claim presented for the first time in his opposition brief.

[12]  Mr. Tsosie's claims that he was denied pain medication during this time will be addressed separately.

upon the record for the Court, Mr. Tsosie has not alleged a plausible Eighth Amendment conditions of confinement claim based on the temporary removal of his mattress.

### C.    Mr. Tsosie's Medical Claims

Mr. Tsosie believes that he did not received proper or timely medical treatment for his left shoulder, gland issues or Hepatitis C while housed at USP-Canaan.

There is no evidence that Mr. Tsosie suffered from a serious medical need, or experienced a medical emergency, that was not attended to by medical staff while housed at USP-Canaan.  Nor is there any evidence that Plaintiff was clearly in need of medical care, or repeatedly requested medical attention, and that those needs were ignored.  The record is replete with documentation as to medical staff's evaluation of Mr. Tsosie's complaints of ear pain and shoulder pain.  A variety of diagnostic tests including x-rays, CT scans and MRIs were ordered, and performed, to evaluate these conditions.  Mr. Tsosie received antibiotics and pain medications as deemed medically necessary.  Although the ENT specialist recommended the removal of his submandibular gland, it noted that it often did not bother Plaintiff, and when it did, he was given antibiotics and pain medication.  Furthermore, there is no indication that the removal of this gland was perceived as an urgent medical condition by either the ENT or prison medical staff.

Next, Mr. Tsosie asserts he was denied pain medication throughout his stay at USP-Canaan because he was restricted to receiving it only once a month, for a

period of only seven days.  The record does not support his claim.  While it is true

that Mr. Tsosie's pain medication, was usually written for seven days at a time, it

was renewable, and was refilled regularly.  Moreover, there is no indication in the

record, nor has Mr. Tsosie pointed to any place in his medical record, where he

requested pain medication and it was withheld or denied.  To the contrary, whenever

Mr. Tsosie sought pain medication, his script was refilled.

In sum, Mr. Tsosie has not shown USP-Canaan medical staff, or the

Defendants, did not take his complaints of pain seriously, or failed to address his

complaints in a timely manner, or delayed or withheld medical treatment for his

shoulder or submandibular gland for non-medical reasons.  Although the procedures

he received, or were scheduled to receive, were not conducted as fast as he would

have liked, or may not have provided him with the relief he had hoped for, he can

hardly claim Defendant or his treating medical care providers at USP-Canaan were

deliberately indifferent to his various medical needs.  *See White v. Napolean*, 897

F.2d 103, 108-10 (3d Cir. 1990).  Likewise, the fact that since his transfer from USP-

Canaan he has received additional or different treatment for his shoulder does not

infer that the treatment he received at USP-Canaan fell below the Eighth

Amendment standard.[13]

The same is true with respect to Mr. Tsosie's Hepatitis C condition and

treatment.  The undisputed record reveals that the BOP conducts routine liver

---

[13]  Mr. Tsosie has submitted documentation that suggests that as of June 29, 2011, medical staff at USP-Lewisburg decided to approach the care of his shoulder injury "conservatively" rather than surgically treating his problem at this time.  *See* Doc. 34-1 at p. 61.

biopsies of inmates with Hepatitis C every five years unless otherwise medically indicated.  There is no evidence in the record, that there was a medically necessary reason to conduct his liver biopsy earlier than was planned by USP-Canaan officials in November 2009.  Moreover, the fact that Mr. Tsosie's work up for a liver biopsy was delayed from June 2009 until sometime in November 2009 because Dr. Holloway was under the impression that Mr. Tsosie had been using intoxicants, has not been shown to have caused Mr. Tsosie any harm, or to be the result of Assoc. Warden Dunbar or HSA Sullivan's actions.  Throughout his stay at USP-Canaan, prison medical staff conducted chronic care evaluations of Mr. Tsosie which included physical evaluations and lab work for his chronic Hepatitis C condition. There is no suggestion in the record that Mr. Tsosie's liver biopsy was initially prompted in June 2009 for any reason other than routine procedure.  To the extent that Mr. Tsosie's 2005 biopsy results were negative for fibrosis, but his most recent biopsy (performed after his transfer) was positive for liver fibrosis, does not suggest how any USP-Canaan medical personnel, or the Defendants, were deliberately indifferent to Mr. Tsosie's Hepatitis C condition.  A reasonable jury could not find that the individual Defendants were deliberately indifferent to Mr. Tsosie's Hepatitis C condition.  To the contrary, he received medical treatment, monitoring, and care for this chronic condition.

Finally, aside from Mr. Tsosie's assertion that he was given medication staff knew him to be allergic to, and consequently suffered an adverse reaction, there is no supportive evidence of the same in his medical record.

-24-

### D.   Associate Warden Dunbar and HSA Sullivan.

To state a viable § 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003).  A "defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*."  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode,* 845 F.2d at 1207).  Individual liability can only be imposed if the state actor played an "affirmative part" in the complained-of misconduct.  *Chinchello v. Fenton* , 805 F.2d 126, 133 (3d Cir. 1986).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  *Argueta v. U.S. ICE*, 643 F.3d 60, 72 (3d Cir. 2011) (quoting *Rode*, 845 F.2d at 1207).  Alternatively, a supervisor may also be held liable under § 1983 if it is shown that he or she "established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).  Thus, supervisor liability may be imposed under Section 1983 only if "the connection between the supervisor's directions and the constitutional deprivation [is] sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue."  *Santiago v. Warminster Tp.* , 629 F.3d 121, 130 (3d Cir. 2010).  Additionally, the absence of an underlying

-25-

constitutional violation precludes any supervisory liability on a "knowledge or acquiescence" or "failure to train" theory. *Crawford v. Lappin*, 446 F. App'x 413, 416 (3d Cir. 2011)(nonprecedential); *Argueta v. U.S. ICE*, 643 F.3d 60, 72 (3d Cir. 2011).

Mr. Tsosie suggests HSA Sullivan treated him with disrespect when he asked her about his medical testing and appointments.  He alleges she "degraded his dignity for asking about his medical issues."  Doc. 42 at p. 47.  Plaintiff does not allege that HSA Sullivan verbally threatened him or that her language was racially or sexually charged.  At most, her actions and verbal statements were demeaning and sarcastic and thus verbally abusive.  However, it is well established that only verbal abuse by prison officials does not violate the Eighth Amendment.  *Mimms v. UNICOR*, 386 F. App'x 32, 35 (3d Cir. 2010).

On November 11, 2009, Mr. Tsosie filed an inmate request to "Health Services" inquiring as to scheduling of his next appointment with the ENT and the MRI of his left shoulder.  Doc. 42 at p. 25.  Assoc. Warden Dunbar responded to this request advising him that his follow up with the appointment ENT doctor "is awaiting an appointment date," and that his MRI was "scheduled to [be] completed when the truck returns to the institution in December."  *Id*. at  at p. 26.  The record reveals that the ENT appointment was not scheduled until January 5, 2010, and the MRI was not completed until May 27, 2010.  While Assoc. Warden Dunbar's response was ultimately inaccurate, she cannot be found to be deliberately indifferent because of this response.  At the time of her response she knew Mr. Tsosie to be under the care of the institution's treating physicians and thus she could defer to their medical

-26-

judgment in the scheduling of such matters based on their knowledge of the urgency of his medical issues.  *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). Moreover, Mr. Tsosie has not demonstrated that, based on Assoc. Warden Dunbar's knowledge at the time, she had any reason to believe that prison doctors were mistreating or not treating him for his various ailments.  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  To the contrary, Assoc. Warden Dunbar was aware that Plaintiff had been evaluated by an ENT specialist in July 2009, and that the recommended CT of his cervical spine was conducted the same month, and that an MRI of his shoulder had been ordered and was scheduled for the next time the "truck return[ed]" to the facility.  Doc. 42 at p. 26.  Accordingly, Mr. Tsosie fails to allege an Eighth Amendment claim of deliberate indifference against Assoc. Warden Dunbar.

Moreover, as noted above, Mr. Tsosie has failed to establish an underlying Eighth Amendment claim of deliberate indifference to his medical needs by USP-Canaan medical staff, there can be no finding of supervisor-defendant liability. Accordingly, Assoc. Warden Dunbar and HSA Sullivan are entitled to summary judgment.  *See Crawford, supra.*


### E.    Motion for Judicial Notice.

On August 22, 2011, Mr. Tsosie filed a Motion for Judicial Notice (Doc. 37) stating that his Eighth Amendment denial of adequate medical care claim is a continuing violation claim that extends beyond his transfer from USP-Canaan.  He

offers a series of Administrative Remedy appeals related to his ongoing efforts to obtain medical care for his various ailments.  A review of these documents confirms that they were all created after his release from USP-Canaan and thus do not pertain to the Defendants in the present action.

An appropriate Order follows.

/s/ A. Richard Caputo
**A. RICHARD CAPUTO**
**United States District Judge**

**Date: April 12, 2012**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RONALD L TSOSIE,                              :
                                       :
      **Plaintiff**                              :
                                         :   **CIVIL NO. 3:CV-10-2104**
   **v.**                                         :
                                         :   **(Judge Caputo)**
ANGELA DUNBAR, *et al.*,                      :
                                         :
      **Defendants**                            :

**O R D E R**

    **AND NOW**, this __12th__ day of **APRIL, 2012**, in accordance with the accompanying Memorandum, it is **ORDERED** that:

1.    Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment (doc. 15) is GRANTED.

2.    The claims against the Bureau of Prisons, and defendants Angela Dunbar, Barbara Sullivan and David Mrad are hereby dismissed due to Plaintiff's failure to state a viable Eighth Amendment claim against them.

3.    The Clerk of Court is directed to enter judgment in favor of defendants Angela Dunbar, Barbara Sullivan, David Mrad and the Bureau of Prisons, and against Plaintiff, Ronald Tsosie.

4.    Mr. Tsosie's Motion for Judicial Notice (doc. 37) is DENIED.

5.    The Clerk of Court shall close this file.

                                     /s/ A. Richard Caputo
                                     **A. RICHARD CAPUTO**
                                     **United States District Judge**